**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| RYAN JUREWICZ, Plaintiff, | **3-19-CV-1893** |
| v. | **NOVEMBER 27, 2019** |
| INCHCAPE SHIPPING SERVICES, INC.; INCHCAPE SHIPPING SERVICES WORLD, LTD; ISS MARINE SERVICES, INC. Defendants | **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, Ryan Jurewicz, as and for his claims against the Defendants alleges as follows:

## I. PRELIMINARY STATEMENT

1. This is Plaintiff, Ryan Jurewicz's ("Plaintiff" or "Mr. Jurewicz") Complaint against Defendants, Inchcape Shipping Services, Inc., Inchcape Shipping Services World, LTD, ISS Marine Services Inc. (collectively "Defendants" or "Inchcape") for unpaid wages pursuant to the Fair Labor Standards Act "(FLSA"), 29 U.S.C.§ 201 et.seq., pursuant to Connecticut General Statutes, and pursuant to the Texas Labor Code, breach of contract, breach of implied contract, unjust enrichment, fraudulent misrepresentation and inducement, negligent misrepresentation and inducement, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress and Promissory Estoppel.

## II. PARTIES

2. Plaintiff, Ryan Jurewicz worked for Defendants in the State of Connecticut and resided in the State of Connecticut during all relevant time periods.

3. During all relevant time periods, Defendant Inchcape Shipping Services, Inc., upon information and belief, is a private company with its principal place of business located at 1210 Hillcrest Road, Mobile, Alabama 36695.

4. During all relevant time periods, Defendant Inchcape Shipping Services World, LTD, upon information and belief, is a private company with its principal place of business located at 1210 Hillcrest Road, Mobile, Alabama 36695.

5. During all relevant time periods, Defendant ISS Marine Services, Inc., upon information and belief, is a private company with a principal place of business located at 1210 Hillcrest Road, Mobile, Alabama 36695.

6. During all relevant time periods, Defendants maintained an office at 53 Water Street, Norwalk, Connecticut 06854 in Norwalk, Connecticut and at 19245 Kenswick Drive, Humble, Texas 77338, where Plaintiff worked.

7. Defendants share common management, common human resource and payroll department, common email system, common corporate executive team and other commonalities among them. Such that the Defendants are considered one joint employer and one corporate enterprise.

8. Defendants, at all pertinent times herein, were Plaintiff's "employer."

9. Defendants' principle business is the provision of maritime services abroad and in the United States.

## III. JURISDICTION AND VENUE

10. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 451, 1331, 1367, the Fair Labor Standards Act of 1938, as amended, codified at 29 U.S.C. § 201 et.seq.

11. The Defendants are subject to the personal jurisdiction of this Court because they regularly transacted business in Connecticut and supplied goods and/or services in Connecticut, have clients in Connecticut, and claims against them herein arose from: (a) the transaction of business in Connecticut and/or (b) tortious acts committed by them in Connecticut and/or (c) tortious acts committed by them outside of Connecticut causing injury to Mr. Jurewicz in Connecticut. Where such parties regularly do or solicit business, or engage in any other persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in Connecticut, or expect or should reasonably expect their acts to have consequences in Connecticut and derive substantial revenues from interstate or international commerce.

12. This court has subject matter jurisdiction over this case and Defendants are therefore subject to the jurisdiction of this court.

## IV. STATEMENT OF FACTS

13. Plaintiff commenced his employment with Inchcape in February 2016 as a Commercial Sales Manager based in Norwalk, Connecticut.

14. Plaintiff was first hired to work in Defendants' Connecticut office, where he resided at the time and worked in that location until being relocated to Defendants' Texas office in 2017. (Did Defendants pay for expense related to his home office, if so then state; this shows Defendants intended the office location to be his home)

15.     At the time of Plaintiff's hiring, he was offered a base salary of $100,000 plus commissions. This compensation arrangement was set forth in conversations and documents presented to Plaintiff during the hiring and onboarding process, including but not limited to an offer of employment letter dated February 10, 2016 (attached hereto as **Exhibit A**) and a Sales Incentive Scheme Agreement (attached hereto as **Exhibit B**), both of which reflect and confirm the sales incentive commission agreement entered into between Plaintiff and Defendants. Specifically, the sales incentive scheme was presented to Plaintiff by HR and Inchcape Chief Commercial Office, Neill Tomlin, before he was hired. The offer of employment letter explicitly references the sale incentive scheme and Plaintiff's eligibility to participate in this plan during his employment.  The language in the sales incentive scheme is clear and expressly entitles Plaintiff to quarterly commission payments relative to his sales contributions to Inchcape, as a component of his regular compensation.

16.     At the time Plaintiff was interviewing with Inchcape, he was also in discussions with other potential employers. His decision to accept the offer of employment with Inchcape was in large part based on the representations made to him regarding his eligibility to earn commissions, as a supplement to his base salary, throughout his employment with Inchcape in a sales role. Plaintiff was confident in his sales abilities and he would not have accepted this position and forfeited other opportunities if this was not a commission position or if it was communicated to him that at any time during his employment, the commission arrangement could or would no longer be in place.

17.     Based on the verbal communications and documentation presented to Plaintiff during the hiring process and the representations made to him during the hiring process and throughout his employment with Defendants, along with the fact that Plaintiff was in a sales role,

Plaintiff reasonably relied on those representations and written communications in deciding to accept a commission based position of employment with Inchcape, and to continue employment there over the next three plus years, including relocating to Texas for Defendants. Plaintiff had a good faith reason to believe that his compensation would at all times include sales-based commissions and in fact, Plaintiff was never told otherwise nor was it every communicated to him that he would no longer be eligible for commissions or that any changes at all were being made to his sales incentive contract, or even being contemplated.

18.     Throughout the course of his employment with Inchcape, any changes in Plaintiff's job duties or title did not affect his eligibility for sales incentive commissions. Plaintiff was always in a sales role and was never told that any job changes would interfere with his ability to earn sales commissions, or that the sales incentive scheme contract was in any way changed or no longer in effect. In fact, Plaintiff was paid some of his duly earned sales commissions sporadically and arbitrarily over the course of his employment. However, he was intentionally denied and continues to be intentionally denied a large portion of his duly earned sales commission wages, despite his repeated requests to be paid these wages and documentation supporting same. In addition, when Plaintiff demanded payment for the unpaid duly earned sales commission wages throughout his employment, it was never once communicated to him that he was not owed these commissions or that he was mistaken in his belief that he was working under a commission agreement that he was owed these commissions. Rather, he was just given the run around and stalled on being paid his duly earned sales commission wages and to this date they remain unpaid.  Plaintiff was repeatedly told by management employees and human resource personnel that they are "looking into it" and "working on it."

19.     On information and belief, all of the sales employees, except Plaintiff, at Inchcape

were working on a commissioned basis. Plaintiff is aware that several similarly situated employees with the same job duties were working under a sales incentive commission arrangement and were receiving commission wages throughout their employment with Defendants, while Plaintiff was being denied his commissions by the Defendants.

20. In his role as Commercial Sales Manager, Plaintiff reported to the EVP Tim Cahill who was based out of the Houston, Texas office.

21. During that first year working under Tim Cahill, Plaintiff was one of the top salespeople at Inchcape, closing business with various companies. Plaintiff asserts that for year-end 2016, pursuant to the Sales Incentive scheme, Plaintiff was owed approximately $5,000 in sales commissions, and to date has not been paid any of those commissions.

22. Inchcape CCO, Neil Tomlin was terminated from Inchcape in or about March 2017, at which time Plaintiff began reporting to Simon Edsall who was relocating from Singapore to London to join the Board as new CCO. He was terminated in or about August 2017 and replaced by Chris Crookall. Plaintiff was told he would be reporting to Thomas Daamsgard. Chris Crookall then became the SVP of Sales and the position of CCO was eliminated at that time.

23. In January 2017, Plaintiff was promoted to rebuild the sales team and take over as Vice President Sales of North America. Plaintiff was asked in May 2017 to relocate from Connecticut to Houston for the position, which he did. All expenses were covered by Inchcape along with a 2-year agreement to stay with company. Plaintiff asked for this “guarantee” due to the amount of turnover in the company. Plaintiff’s onboarding communications and written documentation regarding this relocation did not make any mention of any change to his eligibility to earn sales commissions, or that a discretionary bonus had at any time or would take

the place of sales commissions based on his individual performance. In fact, this was a promotion based on his significant sales results and he was awarded and accepted this promotion as continued "incentive" to achieve sales results and to be compensated (base compensation plus commissions) relative to his personal success, in addition to an increase in base compensation. However, Plaintiff did not receive his full and earned sales commissions during this time.

24.     During this same time period, Plaintiff was specifically told by Steve Deprez that nothing about his compensation structure would change.

25.     Without question, had it ever been communicated to Plaintiff at the time of his promotion in January 2017 that he would be forfeiting his ability to continue to work under the sales incentive scheme or that in some way paying him his duly earned commissions would be compromised or the terms of his employment compensation and sales incentive scheme altered in any way to his detriment, he would never have agreed to relocate or to accept this new promotion. In fact, no such conversation or statements were ever contemplated or made to Plaintiff by anyone at Inchcape. And not only did Inchcape pay Plaintiff for some of his commissions earned during the period of time following his job promotion, at no time when he requested payment of his duly earned sales commissions for that year (and the following years), was he ever told or was the argument ever made by anyone at Inchcape that this new position/promotion made him ineligible for or affected in any way his sales commission arrangement. Rather, he was given the run around and stalled, with no concrete reason or explanation provided at all for the delay and failure to pay these commission wages.

26.     For the year end 2017, Plaintiff experienced significant growth from his accounts. 1At this point, Plaintiff was reporting to his new boss, Thomas Dammsgard who said he did not know anything about his commissions and would refer the matter to Human Resources. But

Plaintiff did not hear anything from Human Resources at that time and continued to be ignored in this regard.

27.    Plaintiff's personnel file shows the requests he made to Defendants to pay him these commission wages, to no avail.

28.    Defendants had additional turnover of management in August 2017 when CCO Simon Edsall was fired, and Inchcape eliminated the CCO position. At that point, the sales teams reported into Thomas Dammsgard, VP of Marine Services.

29.    Then Simon Morse, CEO stepped down in January 2018 and Chris Crookall recreated and reclaimed the CCO position. When Chris got promoted, he then promoted Plaintiff to VP Commercial of Americas. It was at this point that Plaintiff was explicitly told by Chris Crookall that the same commission structure would apply for him in his newly promoted role, as he had been working under since 2016. Plaintiff was also told by Chris that they were working on revising the old commission structure and passing a new structure by the board. However, Plaintiff never heard about another commission structure and was expressly assured by Defendants that the commission agreement he was currently working under would be in effect until board could figure out another one.

30.     In addition to the representation made by Chris Crookall, and the fact that Plaintiff did receive some commission payments in 2017, following his promotions, it was fully reasonable for him to expect that he was eligible for sales incentive commissions under the same compensation agreement as when he was hired, as no review of or amendments to the sales incentive agreement were ever contemplated, discussed, communicated, mentioned or decided. In addition, Plaintiff's new promoted position entailed the same job duties as his former position, with the exception that he would also now manage others in the sales group. Plaintiff was still

responsible his own sales performance and sales continued to be his primary job duty. Also, there were other similarly situated sales employees receiving commissions throughout all relevant time periods that Plaintiff was not receiving a commission..

31.     In 2018, Plaintiff achieved personal growth of approximately $1.3 million for Inchcape, which amounted to a calculation of atleast approximately $60,000 in duly earned commissions for that year. Plaintiff has not been paid any of those commissions for the year to date and has been willfully and intentionally denied wages by Defendants without justification.

32.     In 2019 year to date, Plaintiff achieved personal growth of approximately $450,00 for Inchcape due in part to the many new accounts he brought in based on his personal relationships, which amounted to a calculation of approximately $36,000 in duly earned commission for that year. Plaintiff has not been paid any of those commissions for the year 2019 to date and has been willfully and intentionally denied wages by Defendants without justification.

33.     In light of the significant commissions owed to Plaintiff, he requested payment for these wages on multiple occasions but continued to be given the runaround and denied payment. Plaintiff was eventually told by Chris Crookall in or about February 2019 that the commissions might be paid via bonus. This was extremely surprising to Plaintiff as there was no discussion of this, no agreement for him to be compensated through a discretionary bonus in lieu of commissions, no explanation for how the bonus was to be calculated, and no prior practice at Inchcape for compensating sales employees in this manner. Specifically, Plaintiff is aware that his colleague, Tormod Ognedal received both sales commissions and bonus. In addition, Eyse Ong and others on the Singapore team were paid commissions during this period of time.

34.     When Plaintiff expressed these concerns to Chris Crookall, he continued to give

Plaintiff false hope regarding the likelihood that he would be able to collect commissions (in addition to any discretionary bonus). An admission in fact that Defendants owed Plaintiff wages. Neither Chris, nor anyone at Inchcape, ever told Plaintiff that he was no longer entitled to his earned commissions. Rather, his commissions wages were unilaterally, intentionally and arbitrarily withheld, with no explanation other than repeated confirmation that Inchcape was "going to get around to paying it", an admission in fact.

35.     Plaintiff specifically asked his group's HR contact, Steve Deprez to address his unpaid commissions, to which he would always respond, "I know. I have told Chris and others and we will get around to it", another admission in fact.

36.     In summary, to the best of Plaintiff's knowledge, he is owed commissions during the years 2016-2019 an amount totaling at least approximately $135,000.

37.     Plaintiff asserts that the commissions due to him are significant and therefore have been intentionally withheld. Inchcape had sufficient notice of the unpaid commissions and for the most part ignored his demands to be paid.  Plaintiff also alleges that part of their failure to pay was also likely due to the fact that the position of CCO was a revolving door and that he had five bosses in three years. This makes Inchcape's acts both intentional and negligent.

38.     Plaintiff was always an exemplary employee at Defendants, as demonstrated by his trajectory at work, his results and the commissions he earned but yet remain unpaid.

39.     In 2016, Plaintiff received a 4 out of 5 employee rating at his yearly performance review.

40.     In 2017, Plaintiff received a 4 out of 5 employee rating at his yearly performance review.

41.     In 2018, Plaintiff received a 3 out of 5 employee rating at his yearly performance

review. Although this is still a satisfactory rating, Plaintiff questioned his then boss Chris

Crookall about it. He explained that it was because the new CEO, Frank Olsen, told him Plaintiff

was too immature. Plaintiff asserts that the CEO's comment was retaliatory and related to an

issue Plaintiff had when he was Head of Operations and he hired his friend Chris Raymond as

Vice President Marine Services. Chris Raymond only lasted 89 days at Inchcape and on

information and belief had six employees file sexual harassment claims against him and the

company, along with a host of many other issues with employees. Frank Olsen was CCO and

then became the CEO, so Plaintiff believes that despite his success in finding and growing the

largest oil account at Inchcape in 2018, he was targeted for his participation in working with

Human Resources, Commercial, Compliance in London in their investigation into his friend,

Chris Raymond's unlawful behavior that resulted in his subsequent termination.

42.     Further to Plaintiff's positive personal performance, Inchcape provides a monthly

report of accounts status in order to understand what accounts are trending positive and which

are not performing well. Every month Plaintiff's accounts that he managed were green. He never

had a bad or negative month in his tenure of employment with Defendants and in fact never had

a negative performance review.

43.     In 2017, Plaintiff grew his accounts by $980,000. Plaintiff was therefore entitled

to a minimum of 4% on this growth, and a multiplier up to 8% based on the growth. As a result,

Plaintiff should have been paid approximately $50,000 in commissions. However, in 2017,

Plaintiff was only paid $17,000 in commissions, resulting in a shortfall in commission wages

totaling approximately $33,000.  In 2018, Plaintiff grew his accounts by $1.3 million. Based on

the above calculations, Plaintiff should have been paid $60,000 in commissions, but he was paid

none. In 2019, Plaintiff experienced growth of $500,000, which calculates to approximately

$36,000 in commission, of which he was paid none.

44.    In 2016, Plaintiff did not receive any of his earned commission wages.

45.    In 2017, Plaintiff did not receive all of his earned commission wages.

46.    In 2018, Plaintiff did not receive any of his earned commission wages.

47.    Inchcape's unlawful and improper handling of his unpaid wages should come as no surprise to him given their otherwise unlawful and improper behavior. The company lacked ethics, good will, stability and direction.

48.    Specifically, in 2017, Frank Olsen, COO at the time hired his friend Chris Raymond as VP Marine Services. Chris was power hungry and aggressive. He also repeatedly harassed women on Plaintiff's team along with others in the office. Six sexual harassment complaints were filed against him, along with many others quitting due to the hostile work environment he contributed to at Inchcape. One of these female employees was Michelle Turner, Project Manager, one was the office secretary, two were Plaintiff's direct reports and one was Celeste in Human Resources. This unlawful behavior persisted for 89 days. Inchcape was aware but no one did anything about it to protect the employees from him. Plaintiff was the voice of the employees and kept advising them to call Human Resources and compliance, and to email and document it.

49.    Eventually, after seeing and hearing about this unacceptable behavior, Plaintiff reported this formally to Human Resources, Frank Olsen and Simon Edsall. Plaintiff told them that Chris was a loose cannon and that he would never have relocated if he knew he was going to be working with someone like him and under these adverse conditions.  As an example, Chris stated to an IT employee that he could "gut a human faster than a deer. Chris was abusive and a bully.  Plaintiff experienced employees crying in his office about this. Plaintiff informed Human

Resources about Chris' behavior, but his complaints were ignored. Plaintiff also had conversations with John De Govia, Vice President of Financial. John was shocked at Chris's behavior and informed his manager in London about his concerns.

50.     Chris Raymond was terminated in May/June 2017 at which time the police needed to be called as he locked himself in the office. He also threw a coffee cup at an Human Resource employee and told him to "get the fuck out."

51.     In March 2017, when Plaintiff agreed to relocate to Houston to better lead the team and was offered a promise of promotion of Vice President Commercial Americas, his new boss was Simon Edsall. However, the day he relocated to Houston, Mr. Edsall was let go from the company and Plaintiff's was told his new boss would be Thomas Daamsgaurd.

52.     Inchcape had also just appointed a new CEO, Simon Morse, Vice President of Sales and other employees said Simon hated salespeople. So, morale within the sales team was very low at this point. Plaintiff and his sales colleagues all got placed into local groups (teams) due to the position of CCO Simon Edsall being eliminated.

53.     Later in 2018, CEO Simon Morse was pushed out due to office politics, and Chris Crookall was named CCO. Plaintiff was told by Chris Crookall that Plaintiff was "his guy". Shortly after that in October 2018, Plaintiff received another promotion and given a raise to $150,000. Plaintiff was now the Vice President of Commercial Americas.  Nothing else about his compensation arrangement was discussed or changed and his job duties essentially remained the same, other than the fact that he was now managing several other sales employees.

54.     During this time, Frank Olsen was promoted to CEO.

55.     Plaintiff also found out that Eyse Ong, Vice President Sales in Singapore was receiving commissions. Despite his numbers being better than hers, she was given a 4 out of 5

performance review rating.

56. On July 15, 2019, Plaintiff submitted his letter of resignation to Inchcape.

57. Plaintiff knew he had to leave due to all of the circumstances described herein. Inchcape had become an unbearable place to work and the environment and lack of response to his unpaid wage requests was taking a toll on his emotional state. In addition, there were significant improprieties taking place at Inchcape that drove Plaintiff to leave. Upon information and belief, Inchcape began over charging for services in ports by holding back commissions and was sued by the federal government.

58. Plaintiff also left because the product was bad and becoming progressively more difficult to stand behind. They also wanted to go to a HUB model to save money and get rid of overtime. In a management meeting, the employees were told to cut overtime across the board.

59. Plaintiff was also dissatisfied with his bonus and felt it was subpar in relation to the contributions he made, his positive performance and stature at work.

60. Plaintiff asserts that Inchcape breached both their express contract and implied contract with him when they denied him my duly earned commissions.

61. Plaintiff asserts that Inchcape violated labor laws when they denied him his duly earned commission wages.

62. Plaintiff asserts that Inchcape acted intentionally when they withheld and denied him his duly earned commission wages.

63. Plaintiff asserts that Inchcape was unjustly enriched when they withheld and denied him his duly earned commission wages.

64. Plaintiff asserts that Inchcape fraudulently and negligently misrepresented to him their intention to pay him sales commission, both at the time of his hiring, and throughout his

employment there.

65.     Plaintiff asserts that Inchcape fraudulently and negligently induced him into accepting their offer of employment and continuing his employment there, based on knowing misrepresentations about his compensation structure.

66.     Plaintiff asserts that it was reasonable for him to rely on and that he did rely on these misrepresentations, to his detriment.

67.     Plaintiff asserts that he suffered extreme emotional distress as a result of being denied hi wages and as a result of the hostile work environment at Inchcape.

68.     Plaintiff asserts that he is entitled to compensatory and punitive/liquidated damages as a result of Inchcape's intentionally and unlawfully denying him his duly earned commission wages.

69.     After placing Defendants on notice of his legal claims, Defendants requested that Plaintiff suspend taking any further legal action or attorney involvement and participate in an informal investigative process with them directly so as to resolve his unpaid commission claim.

70.     Plaintiff was not optimistic that this could be resolved amicably with Defendants. Nevertheless, Plaintiff participated in a call with Defendants and without his counsel present on October 9, 2019.

71.     Present on this call were Plaintiff, Chris Crookall and Steve Deprez. During the call, Defendants asked Plaintiff to present why he believed he was owed these commissions. Plaintiff explained to them that there was never any conversation, documentation, communication, meeting, or other dealings that would have ever lead him to believe that he was not working under a commission structure as he was since the time of his initial hiring and for the duration of his employment. This is all elaborated on in further detail in Plaintiff's original

affidavit provided to Defendants prior to litigation. Plaintiff also stated at this meeting that he was paid for commission intermittently throughout his employment and that the only reason ever articulated to him for the lack of regularity in Defendants' disbursement of his commission payouts was administrative and it was never once communicated to him that he was working under a bonus only compensation structure and no longer entitled to commissions.

72. Despite Plaintiff's position on this, Defendants still refused to pay him his commissions, in violation of state and federal wage and hour laws. What Plaintiff hoped would be a good faith process towards an amicable resolution, only amounted to a nuisance value offer to make Plaintiff go away and to keep this out of the courts, and even that offer came along with the contingency that Plaintiff continue to be involved in helping Defendants defend itself in a harassment lawsuit being brought against them by an employee during the time that they both worked there, and explained further herein below.

73. Plaintiff attempted in good faith to try to negotiate with them subsequent to this phone call in an effort to avoid litigation and to be made whole for his earned commissions, but Defendants put the brakes on any attempt to resolve this, refused to increase their offer and continued to breach their contract with Plaintiff, violate his rights and deny Plaintiff his due wages.

74. During that call, Defendants stated that they had "documentation" to show that he had agreed to and was knowingly working under a discretionary bonus only compensation structure. However, they did not and still have not produced any such documentation. Plaintiff denies any knowledge of this accusation and it is a fabrication by Defendants.

75. Furthermore, it was confirmed during that call that Plaintiff was indeed paid a commission in the 3rd quarter of 2017 under this same commission scheme contract that he

entered into at the time of his hiring. Clearly, Plaintiff was paid this commission because he was owed and due this by virtue of the verbal and written agreements between Plaintiff and Defendants regarding Plaintiff's "commission" compensation arrangement during his employment.

76.     Plaintiff asserts that he would never have agreed and did not agree to a discretionary bonus in lieu of commissions. Plaintiff protested upon receipt of the bonus payment as an alternative to his earned commissions.

77.     In addition to unlawfully withholding wages, upon information and belief, Tim Cahill, Executive Vice President North America wrongfully terminated five employees in 2016 based on their age and their related high rate of pay. Tim was ruthless in wanting to push out and get rid of the older employees, all of whom were terminated without legitimate reason and under an inference of age discrimination.

78.     Furthermore, upon information and belief, Chris Raymond, Vice President of Operations had somewhere between 5-7 sexual harassment lawsuits brought against him during the time that Plaintiff was employed there. He treated the employees despicably, abusively and created a hostile work environment. On more than one occasion, Plaintiff recalls hearing him tell an employee that he would "gut them like deers." He also made brass remarks about employee's physical shortcomings. He would often make fun of Plaintiff's weight and call him a "fat ass."

79.     As to the sexual harassment claims against him, Chris Raymond was even more verbally abusive to the women at work. He often made sexually charged and offensive comments to the women, as well as sexually charged and offensive gestures to the women. In fact, Plaintiff was so distressed and upset by this behavior, that he informed Defendants that he would not be relocating to Texas, as they wanted him to, if it meant he had to work alongside Chris Raymond.

80.    Plaintiff is aware that the abused women in the office reported his behavior to Human Resources, but Chris Raymond was being protected by Frank Olsen the then COO, now CEO of Defendants. As a result, and despite all the grievances lodged against, him. Defendants did not do anything to prevent, correct or stop this behavior and Chris was permitted to remain working there and free from any discipline.

81.    As if the environment at work was not hostile and offensive enough, Plaintiff is also aware of financial improprieties that were taking place at Defendants. In 2018-2019, Plaintiff personally witnessed Crowley, a United States Government ship company, which is supposed to be charged at cost, being over charged by more than $150,000. The team in south America would actually brag about how much money they had improperly made off the ship. Plaintiff informed Joseph Bruno, Vice President South America about these improprieties and the fact that these were U.S. Government contract ships that should be billed at cost.

82.    The contract with Crowley required that they would pay net 30 days after they sailed. The Brazil office in Rio constantly pressured Plaintiff for funding from Crowley and even went around his back to secure money from Crowley. Crowley is part of the U.S. Government fleet of ships that they knowingly overbilled and breached their contract.  When Plaintiff raised this issue to management, it fell on deaf ears and Plaintiff was afraid to take the matter any further for fear of retaliation. His complaints to management about the improper activity were ignored and the improper acts were permitted to continue.

83.    Plaintiff was also aware that Defendants was overcharging, overbilling and committing potential financial misconduct and possible fraud on their FEMA Contracts, which are also supposed to be billed at cost. This misconduct went on in plain sight, so upon information and belief, Plaintiff asserts that other employees were also aware that this was going

on but were afraid to fully speak up about it.

84. Plaintiff asserts that his commissions were being intentionally held to his detriment and to Defendants' benefit because they needed the money. Defendants were experiencing serious operational issues that continued into 2019. They lost two large clients this year and the company was no longer realizing a profit. This is on top of the litany of litigation and potential litigation they find themselves in, as described herein above related to their many misdeeds. Defendants' bad acts against Plaintiff and others were motivated by greed and a total lack of ethics.

## V. COUNT ONE: WAGE VIOLATION OF CONN.GEN. STAT. §§ 31-71a TO 31-71i; CLAIM FILED PURSUANT TO § 31-72 AGAINST ALL DEFENDANTS

85. The allegations contained in Paragraph 1-84 are incorporated herein by reference.

86. Plaintiff brings this claim under §§ 31-72 of Connecticut's Wage and Hour Law, Conn. Gen. Stat. § 31-72 et.seq. against the Defendants.

87. At all relevant time periods, Defendants were consider an "employer" within the meaning of Conn.Gen.Stat. § 31-58(d).

88. At all relevant time periods, Defendants employed Plaintiff within the meaning of Conn. Gen. Stat. § 31-58(e).

89. Plaintiff's earned commissions are considered wages within the meaning of Conn. Gen. Stat. § 31-71a (a) which defines wages as compensation for labor or services rendered by an employee whether the amount is determined on a time, task, piece, commission or other basis of calculation.

90. Defendants knowingly and in bad faith failed to pay wages in accordance with the

Sales Incentive Scheme Agreement, duly entered into between the parties, in violation of Conn. Gen. Stat. § 31-72 et.seq. The Defendants failed to pay Plaintiff wages, in the form of duly earned and calculable commissions as set forth under the Sales Incentive Scheme Agreement, based on Plaintiff's individual performance and results.

91. Defendants failed to pay Plaintiff his commission wages throughout the years 2016 to the present for a total of approximately $135,000, an exact value that cannot be readily calculated without access to the books and records of the Defendants' Company.

92. Plaintiff informed Defendants of their failure to pay these wages on numerous occasions, up to the present time. Defendants never indicated to Plaintiff that he was not entitled to these wages but did acknowledge that the wages were outstanding and would be addressed.

93. Defendants still unlawfully refuses to pay these wages to Plaintiff.

94. Defendants' failure to pay Plaintiff's wages is willful, wanton, reckless and in bad faith.

95. As a direct result of Defendants' intentional acts, Plaintiff has suffered and continues to suffer damages.

96. Plaintiff is entitled to an award of damages for unpaid wages, plus liquidated damages in an equal amount (double damages), plus interest and attorneys' fees in an amount to be determined at trial. Conn.Gen.Stat. § 31-68.

## VI. COUNT TWO: WAGE VIOLATION OF TEXAS LABOR CODE TITLE 2, CHAPTER 61, SUBCHAPTER A and B AGAINST ALL DEFENDANTS

97. The allegations contained in Paragraph 1-96 are incorporated herein by reference.

98. Plaintiff brings this claim under Texas Labor Code Title 2, Chapter 61, against the

Defendants.

99.     At all relevant time periods, Defendants were considered an "employer" within the meaning of the Texas labor code.

100.     At all relevant time periods, Defendants employed Plaintiff within the meaning of the Texas Labor Code.

101.     Plaintiff's earned commissions are considered wages within the meaning of Section 611.001 of Texas Labor Code which defines wages as wages means compensation owed by an employer for:(A)labor or services rendered by an employee, whether computed on a time, task, piece, commission, or other basis.

102.     Defendants knowingly and in bad faith failed to pay wages in accordance with the Sales Incentive Scheme Agreement, duly entered into between the parties, in violation of Texas Labor Code. The Defendants failed to pay Plaintiff's wages, in the form of duly earned and calculable commissions as set forth under the Sales Incentive Scheme Agreement and based on Plaintiff's individual performance and results. These unpaid commission wages were not discretionary and were not considered a bonus or a discretionary bonus.

103.     Defendants failed to pay Plaintiff his commission wages throughout the years 2016 to the present for a total of approximately $135,000, an exact value that cannot be readily calculated without access to the books and records of the Defendants' Company.

104.     Plaintiff informed Defendants of their failure to pay these wages on numerous occasions, up to the present time. Defendants never indicated to Plaintiff that he was not entitled to these wages but did acknowledge that the wages were outstanding and would be addressed.

105.     Defendants still unlawfully refuses to pay these wages to Plaintiff.

106.     Defendants' failure to pay Plaintiff's wages is willful, wanton, reckless and in bad

faith.

107. As a direct result of Defendants' intentional acts, Plaintiff has suffered and continues to suffer damages.

108. Plaintiff is entitled to an award of damages for unpaid wages, plus liquidated damages in an equal amount (double damages), plus interest and attorneys' fees in an amount to be determined at trial.

## VII. COUNT THREE: WAGE VIOLATION OF FAIR LABOR STANDARDS ACT (FLSA) 29 U.S.C. SECTION 201 ET.SEQ. AGAINST ALL DEFENDANTS

109. The allegations contained in Paragraph 1-108 are incorporated herein by reference.

110. Plaintiff brings this claim under the Fair Labor Standards Act, 29 U.S.C. § 201e et.al. (FLSA) against Defendants.

111. At all relevant time periods, Defendants were considered an "employer" within the meaning of the FLSA.

112. At all relevant time periods, Defendants employed Plaintiff within the meaning of the FLSA.

113. Plaintiff's earned commissions are considered wages within the meaning of the FLSA as they were part of and meant to be included with Plaintiff's regular pay and were not discretionary.

114. Defendants knowingly and in bad faith failed to pay wages in accordance with the Sales Incentive Scheme Agreement, duly entered into between the parties, in violation of the FLSA. Defendants failed to pay Plaintiff's wages, in the form of duly earned and calculable

commissions as set forth under the Sales Incentive Scheme Agreement and based on Plaintiff's individual performance and results. These unpaid commission wages were not discretionary and were not considered a bonus or a discretionary bonus.

115. Defendants failed to pay Plaintiff his commission wages throughout the years 2016 to the present for a total of approximately $135,000, an exact value that cannot be readily calculated without access to the books and records of the Defendants' Company.

116. Plaintiff informed Defendants of their failure to pay these wages on numerous occasions, up to the present time. Defendants never indicated to Plaintiff that he was not entitled to these wages but did acknowledge that the wages were outstanding and would be addressed.

117. Defendants still unlawfully refuses to pay these wages to Plaintiff.

118. Defendants' failure to pay Plaintiff's wages is willful, wanton, reckless and in bad faith.

119. As a direct result of Defendants' intentional acts, Plaintiff has suffered and continues to suffer damages.

120. Plaintiff is entitled to an award of damages for unpaid wages, plus liquidated damages in an equal amount (double damages), plus interest and attorneys' fees in an amount to be determined at trial.

## VIII. COUNT FOUR: UNJUST ENRICHMENT AGAINST ALL DEFENDANTS

121. The allegations contained in Paragraph 1-120 are incorporated herein by reference.

122. Plaintiff asserts that Defendants were unjustly enriched when Defendants failed to pay Plaintiff his duly earned commissions, to his detriment.

123.     Plaintiff provided valuable services to Defendants in his role as a sales employee resulting in significant and calculable financial benefit to Defendants, to Plaintiff's detriment.

124.     Defendants unjustly and improperly failed to pay Plaintiff for the benefits they received from his services and they retained the benefit to Plaintiff's detriment.

125.     Defendants took undue advantage of Plaintiff by virtue of their actions, as set forth herein above.

126.     Defendants' retention of any such benefits that they collected directly and/or indirectly violated principles of justice, equity and good conscience. Justice requires that compensation be given to Plaintiff for his services rendered to the Defendants and for which he reasonably expected to receive full and fair renumeration.

127.     As a direct result of Defendants' intentional acts, Plaintiff has suffered and continues to suffer damages to his detriment.

128.     Defendants should be required to disgorge to the Plaintiffs benefits that they have unjustly  obtained.

129.     Plaintiff is entitled to equitable relief for the claim of unjust enrichment.

## IX.      COUNT FIVE:     <u>BREACH OF IMPLIED CONTRACT AGAINST ALL DEFENDANTS</u>

130.     The allegations contained in Paragraph 1-129 are incorporated herein by reference.

131.     The Defendants entered into an implied contract with the Plaintiff to pay him wages in the form of sales commissions based on his sales results as a sales manager.

132.      The Defendants agreed by its words, actions, and/or conduct  to compensate Plaintiff for his work in the form of sales commissions calculated based on Plaintiff's sales

results. Defendants paid Plaintiff salary plus commissions for the first year of his employment and then sporadically thereafter.

133.    Plaintiff never communicated to Plaintiff verbally or in writing that he was not entitled to sales commissions, that he was no longer going to be paid commissions or that his compensation arrangement was changing from salary plus commissions to just salary.

134.    Plaintiff closed business which resulted in sales for the Defendants' benefit, as set forth more particularly herein above.

135.    Plaintiff expected to be compensated for this work, throughout the duration of his employment, in the form of salary plus commission payments calculated pursuant to the Sales Incentive Scheme Agreement entered into between the parties at the time of Plaintiff's hiring by Defendants.

136.    Plaintiff rendered services for the benefit of the Defendants for which he reasonably expected to receive full and fair renumeration.

137.    The Defendants availed itself of the benefits derived from the Plaintiff's services.

138.    Plaintiff asserts that is was always both parties intentions that Plaintiff be compensated as a sales manager relative to his performance and results in the form of commissions, in addition to his base salary.

139.    Plaintiff never intended any discretionary bonus to take the place of his duly earned sales commissions based on his personal results.

140.    Defendants breached their implied contract with Plaintiff when they failed to pay him his duly earned commissions.

141. Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## X. COUNT SIX: BREACH OF CONTRACT AGAINST ALL DEFENDANTS

142. The allegations contained in Paragraph 1-141 are incorporated herein by reference

143. Plaintiff entered into an agreement with the Defendants wherein Defendants agreed to pay him wages in the form of commissions pursuant to their Offer of Employment dated February 10, 2016 (attached hereto as **Exhibit A**) and the Sales Incentive Scheme Agreement (attached hereto as **Exhibit B** ) both of which reflect and confirm the sales incentive commission agreement entered into between Plaintiff and Defendants.

144. Plaintiff closed business which resulted in sales for Defendants and which earned him sales commission wages pursuant to the Sales Incentive Scheme Agreement.

145. Plaintiff performed and fulfilled all of his contractual employment obligations.

146. Defendants breached their agreement with Plaintiff, when they failed to fulfill their contractual obligation to pay Plaintiff his duly earned sales commissions for the years 2016-2019, calculated to be approximately $100,000, but to be modified upward and more exactly once Plaintiff receives discovery related to all sales he was responsible for during the tenure of his employment.

147. Plaintiff was never provided with a new Sales Incentive Scheme Agreement and was intended to be working at all times herein under the original agreement entered into and executed by the parties at the time of his hiring.

148. Defendants made repeated statements of admission to Plaintiff that he was going to be paid these commissions throughout the duration of his employment and was never told that

the Sales Incentive Agreement was no longer in effect, revised, replaced by bonus or otherwise invalid.

149. Plaintiff is entitled to his unpaid sales commissions for his sales results for the years 2016-2019, based on Defendants' willful and material breach of the Sales Incentive Scheme Agreement in the amount of approximately $100,000 or more.

150. As of the present date, Defendants have refused to pay Plaintiff his duly earned commission wages and remains in breach.

151. Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XI. COUNT SEVEN: FRAUDULENT MISREPRESENTATION AND FRAUDULENT INDUCEMENT AGAINST ALL DEFENDANTS

152. The allegations contained in Paragraph 1-151 are incorporated herein by reference.

153. Plaintiff entered into an employment agreement with the Defendants wherein Defendants agreed to pay Plaintiff his compensation in the form of salary plus commissions for the duration of his employment in a sales position with Defendants

154. Defendants knew that when they entered into the February 10, 2016 employment agreement with Plaintiff that they had no intention of paying Plaintiff his commissions beyond the first year. Defendants promised Plaintiff these terms in order to induce him into accepting employment with them. Plaintiff reasonably relied upon the Defendants' representations regarding his compensation and calculation of commissions pursuant to Defendants' commission scheme when he agreed to accept their offer of employment with Defendants. Plaintiff suffered pecuniary damages as a result.

155. Plaintiff would not have accepted this position with Defendants if he was truthfully informed during the hiring process that his commission agreement would not be in effect after a year, or at any time during his employment while working in a sales role for Defendants. Plaintiff turned down other financially advantageous opportunities based on Defendants' false representation that this sales position would entitle him to salary plus commission throughout the duration of his employment in a sales role for Defendants.

156. Defendants made a false representation that Plaintiff's compensation as a sales employee would add at all times include salary plus commissions. Defendants knew that this representation was false at the time it was made during the hiring process.

157. Defendants made ongoing false representations to Plaintiff when they induced him to relocate to a sales manager role in Texas based on the false premise that he would continue to work under his salary plus commission compensation arrangement. If Plaintiff was truthfully informed at that time that he would no longer be receiving commissions for his sales results, he would not have agreed to relocate to Texas for this new position with Defendants. Plaintiff reasonably relied on this false representation and agreed to relocate to Texas for this new sales position with Defendants.

158. Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XII. COUNT EIGHT: NEGLIGENT MISREPRESENTATION AND NEGLIGENT INDUCEMENT AGAINST ALL DEFENDANTS

159. The allegations of paragraphs 1-158 are incorporated herein by reference.

160. Plaintiff entered into an employment agreement with the Defendants wherein Defendants agreed to pay Plaintiff his compensation in the form of salary plus commissions for

the duration of his employment in a sales position with Defendants

161. Defendants negligently mischaracterized and misrepresented their compensation structure, business practices and intention to compensate Plaintiff in the form of salary plus commissions for the duration of his employment in a sales position with Defendants, at the time of his hiring and when he was asked to relocate to Texas for a new sales position with Defendants.

162. Defendants knew or should have known that their representations regarding compensation to Plaintiff were false and misleading. Plaintiff reasonably relied on Defendants' representations in deciding to accept Defendants' offer of employment and in deciding to relocate to Texas. Plaintiff suffered pecuniary harm as a result.

163. Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XIII. COUNT NINE: <u>BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS</u>

164. The allegations of paragraphs 1-163 are incorporated herein by reference.

165. Defendants breached the covenant of good faith and fair dealing in unlawfully misrepresenting the terms and conditions of Plaintiff's employment, breaching his employment agreement, willfully failing to pay wages in the form of commissions, and inuring the right of Plaintiff to receive the benefits of his employment agreement. No reasonable employee of Defendants would expect his employer to intentionally and willfully breach an agreement to pay hard earned compensation to an employee. Defendants' willful failure to pay Plaintiff the agreed upon compensation is the direct and proximate cause of his damages, and a breach of the covenant of good faith and fair dealing.

166. Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XIV. COUNT TEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

167. The allegations of paragraphs 1-166 are incorporated herein by reference.

168. Plaintiff has suffered emotional distress as a result of Defendants' actions as more fully described herein above.

169. Defendants knew or should have known that by failing to pay Plaintiff his hard-earned sales commission, and by giving him the run around for over two years on this, he was likely to experience emotional distress.

170. Defendants' actions in this regard were extreme, outrageous and the cause of Plaintiff's distress.

171. Plaintiff did in fact experience sever emotional distress from being denied his wages, from his treatment at work and from the stress of relying on promises and then not being able to realize the results of his hard work and results.

172. Plaintiff has suffered from severe stress, anxiety and related physical symptoms.

173. Defendants should be held liable on this count and Plaintiff awarded all appropriate relief.

## XV. COUNT ELEVEN: PROMISSORY ESTOPPEL AGAINST ALL DEFENDANTS

174. The allegations of paragraphs 1-173 are incorporated herein by reference.

175. Plaintiff is entitled to equitable relief and recovery of damages based on promissory estoppel.

176. Defendants have benefited from Plaintiff's work effort and sales results and Plaintiff has not been properly or justly compensated.

177. Defendants refuse to pay Plaintiff his earned commissions, to his detriment.

178. Plaintiff reasonably relied on Defendant's clear and definite representations and promises that he would get paid commissions for his sales results.

179. Defendants' words and actions indicated their intention to pay commissions upon which Plaintiff relied.

179. Plaintiff suffered financial damages in reliance on Defendants' promises.

180. Defendants should be held liable on this count and Plaintiff awarded all appropriate relief.

## XVI. DEMAND FOR RELIEF

Plaintiff hereby requests the following relief:

A. Award of compensatory damages to Plaintiff;

B. Award punitive/liquidated damages to Plaintiff;

C. Award attorney's fees and costs;

D. Award pre-judgment interest;

E. Award post-judgment interest;

F. Award such other relief in law or equity as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.

PLAINTIFF,
RYAN JUREWICZ

By: ________/s/_________

Mark P. Carey (ct17828)
Jill Halper (ct30668)
Carey & Associates, P.C.
71 Old Post Road, Suite One
Southport, CT 06490
(203) 255-4150 tel.
(203) 255-0380 fax.
Mcarey@capclaw.com
His Attorney

# EXHIBIT A



10th February 2016

**PERSONAL & CONFIDENTIAL**

Ryan Jurewicz
4 Arrowhead Lane
Shelton, CT 06484

RE: Offer of Employment

Dear Ryan,

I am pleased to confirm in writing ISS Marine Services Inc.'s (ISSMS) offer of employment to you for the position of Sales Manager located in Norwalk, Connecticut.  Your hire date will be Tuesday, March 1, 2016.

The overall duties of your role are outlined in the job description following this letter and will be further defined and directed by Line Manager, Tim Cahill, Executive Vice President-North America, subject to change from time to time.

You are expected to devote your full business time, attention and efforts in performing your duties in this job and to exert your best efforts in performing such duties.

The following terms and conditions will apply:

1.  Salary:          $3,346.15/bi-weekly pay period (Equivalent to $100,000/annum.)

2.  Auto Allowance:   $207.70/bi-weekly pay period (Equivalent to $5,400/annum.)

Sales Incentives
A Sales Incentive Scheme has been implemented with the aim of rewarding individual contribution against revenue growth targets.  You will find details of the Scheme attached for your information.  Eligibility to participate is immediate from your hire date.  The Sales Incentive Scheme is provided on a discretionary basis and plan guidelines may change from time to time.  Incentives may be forfeited if employment ceases before the end of the relevant financial year.

**Benefits**
Health and Welfare Plans
Upon your commencement with ISSMS, you will be eligible to participate in all ISSMS's company benefit plans which includes Medical, Dental & Prescription Insurance, Vision Insurance, Life Insurance, Short-Term Disability insurance, Long-Term Disability Insurance, Accidental Death & Dismemberment Insurance, Supplemental Employee & Dependent Life Insurance.  (Benefit plans and employee contribution rates may change from time to time.  The terms and conditions of the plans are defined by the formal plan documents.)

Savings Plan with Company Match
You will be eligible to participate in the 401(k) plan available to employees based on the terms and conditions of the plan, which may change from time to time.

Annual Leave
ISSMS provides paid vacation and personal leave on a calendar year basis.  New hire eligibility is pro-rated from the date of hire and available at the next January 1st following date of hire.   Once full eligibility is reached, you will be entitled to 160 hours paid vacation and 80 hours paid personal leave.   Unused vacation and personal leave will be forfeited at the end of each calendar year.

Inchcape
Shipping Services

Employment Policies and Procedures
ISSMS expects you to comply with all policies, procedures and standards established by ISSMS, including but not limited to all policies stated in ISSMS' *Employee Handbook*, as amended from time to time.

**"At Will" Employment**
Employment with ISSMS is for no definite period of time. Throughout the employment period with ISS, either you or ISSMS may terminate employment, with or without cause or advance notice.

**Confidentiality**
Except as required by law, both you and the company agree not to disclose or publicize the terms of this agreement or to assist others to disclose or publicize the terms of this agreement. This non-disclosure agreement applies to the parties' attorneys, agents, officials, managers, employees and spouses as well as to the named parties.

As a result of your employment with the Company, you will have access to confidential information about the Company and its business. Therefore, except upon direct written authority of the Chief Financial Officer, you agree not to utilize for personal benefit, or directly or indirectly divulge or communicate to any person or entity any confidential information concerning the Company and its business that you obtained at any time during your employment.

Confidential information includes, without limitation, proprietary techniques and confidential information that the Company has or will develop, compile, or own, or that the Company receives under conditions of confidentiality. Confidential information includes not only information disclosed by the Company (including its employees, agents, and independent contractors) or its clients to you in the course of employment but also information developed or learned by you during the course of your employment with the Company. Confidential information is to be broadly defined and includes information having potential or actual commercial value to the Company; information that, if disclosed without authorization, could be detrimental to the Company's interests or that of its clients; confidential information includes, but is not limited to Agency/Principal agreements and contracts. Specifically, the Company considers the following information to be confidential information and/or trade secrets that includes but is not limited to: salaries, pricing schedules, Principal contracts and target market information. This paragraph provides protection independent of, and in addition to, those created by the Uniform Trade Secrets Act.

This agreement shall be governed by the laws of the State of Connecticut.

**Proper Law**
By Signing below, ISSMS and you agree that this letter is intended to be a complete expression of the terms of our offer of employment with ISSMS. Therefore, in accepting our offer, you acknowledge you have not relied on any oral or written statements or representations by any Company employee that in any way conflict with this letter.



We look forward to you joining the ISS Marine Services Inc.

Sincerely,

Brenda McClure

Brenda McClure
Regional Human Resources Manager-Americas

Accepted:

_______________________________ Date: ____________________________

Ryan Jurewicz

# EXHIBIT B

Inchcape
Shipping Services

Dear Ryan,

**Inchcape Shipping Services Group – 2016 Sales Incentive Scheme**

We are pleased to formally confirm your participation in the 2016 Sales Incentive Scheme.

The scheme is a new concept for ISS and is aimed at evolving our engagement with the market and our customer base to drive maximum growth from your chosen accounts, through deeper penetration and through adopting a solution selling methodology.

This incentive provides a great opportunity to be recognised and rewarded for your individual contribution as an account owner. The scheme is uncapped with no upper limit applied to the amount of incentive which can be earned. The scheme is structured using an easy to understand methodology to significantly increase your annual earnings and is heavily based on rewarding the strong performers who deliver the most value to the Group.

This scheme runs from the 1st January 2016 to 31st December 2016 after which it will be reviewed and amended if necessary.

**Incentive Calculation**

To calculate your quarterly commission payment, we establish the growth by taking the combined total revenue from your assigned accounts less the total revenue for the same period in 2015. From this growth your cost to company is deducted leaving you with your true contribution to the company. Your commission is then calculated on this contribution by applying a percentage as defined below with an increasing percentage applied the higher the multiple of your cost to company is achieved.

| Basis for incentive | 1x - 3x CTC | 3x to 5x CTC | Over 5x CTC |
|---|---|---|---|
| Revenue growth secured globally from accounts | 4.00% | 6.00% | 8.00% |

Additional details of how the incentive scheme works are as follows:

- The incentive is calculated independently on a quarterly basis.
- All revenue generated from the account is included towards the incentive calculation.
- Revenue is assigned to an account based on the nominating party (nominator).
- Revenue related to any accounts assigned during the year will apply from the start of the next quarter after which it was assigned.
- This scheme replaces any other ISS bonuses schemes for the selected sales individuals.

Although based purely on revenue, a profit margin assessment may be made on any high value, low margin business to ensure it qualifies as adding shareholder value.

Notable exemptions to this scheme include any revenue related to ISS Machinery, ISS GMT, ISS Palumbo, Freight Forwarding, Launch Charter Hire and Liner Agency.

Exceptional circumstances including bankruptcy or other material changes to customer business which is out of ISS' control may be adjusted when working out overall revenue growth.

Incentive payments will be processed 3 months in arrears based on invoiced revenue which will reward progress more regularly and assist the management of cash flow at the same time. For significant amounts over 10x Cost to Company, the company may consider an additional deferral to spread the benefit of the incentive received. Any discrepancies will be resolved and any adjustment due to the Plan Participant will be paid as soon as possible thereafter.

I hope that you will agree that this scheme provides a fantastic opportunity for you to be rewarded for the value you bring to the group and is clearly aligned to the Group's strategy and priority of delivering revenue growth and increased customer engagement.